**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

SHERYL K. DOSS,

Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

Defendant.

No. C06-0147

**RULING ON REQUEST FOR**
**JUDICIAL REVIEW**

-----------------------

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II. PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III. PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV. FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A. Doss' Education and Employment Background* . . . . . . . . . . . . . 4
    *B. Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . . 5
        *1. Doss' Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *2. Angela Jenkins' Testimony* . . . . . . . . . . . . . . . . . . . . . 7
        *3. Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . 8
    *C. Doss' Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        *1. Physical Health* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        *2. Mental Health* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*V. CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    *A. ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . . 20
    *B. Doss' Residual Functional Capacity* . . . . . . . . . . . . . . . . . . . 22
        *1. Dr. Schroeder's Opinions* . . . . . . . . . . . . . . . . . . . . . . 23
        *2. Function-by-Function Assessment of Doss' Mental RFC* . . . . . . 28
        *3. The Nebulizer and The Combined Effects of Doss' Mental and*
           *Physical Health* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    *C. Reversal or Remand* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*VI. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*VII. ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# I. INTRODUCTION

This matter comes before the court on Plaintiff Sheryl K. Doss' request for judicial review of the Social Security Commissioner's decision to deny her December 11, 2003 application for Title XVI supplemental security income ("SSI") benefits (docket number 3). Doss asks the court to reverse the decision of the Commissioner of Social Security ("Commissioner") and to order the Commissioner to provide her SSI benefits. In the alternative, Doss requests the court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

Doss applied for SSI benefits on December 11, 2003. In her application, Doss alleged an inability to work since December 31, 2002 due to back pain, breathing difficulty, complications from hernia surgery, and depression. On May 7, 2004, Doss' application was denied. On October 19, 2004, her application was denied on reconsideration. On December 2, 2004, Doss requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 5, 2005, Doss appeared with counsel before ALJ Jean M. Ingrassia for an administrative hearing. Doss, her daughter, Angela Jenkins, and vocational expert Carma Mitchell testified at the administrative hearing. In a decision dated March 30, 2006, the ALJ denied Doss' claim. The ALJ determined that Doss was not disabled and was not entitled to SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Doss appealed the ALJ's decision. On August 24, 2006, the Appeals Council denied Doss' request for review. Consequently, the ALJ's March 30, 2006 decision was adopted as the Commissioner's final decision.

On November 1, 2006, Doss filed this action for judicial review. The Commissioner filed an answer on March 8, 2007. On May 17, 2007, Doss filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that there is other work she can perform. On July 12, 2007, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the court to affirm the ALJ's decision. Doss filed a reply brief on July 23, 2007. On

April 20, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 1383(c)(3) provides that the Commissioner's final determination following an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3).[1] 42 U.S.C. § 405(g) provides the court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183,

---

[1] 42 U.S.C. § 1383(c)(3) provides:

> The final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g).

1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Doss' Education and Employment Background

Doss was born on June 30, 1957, and completed the ninth grade. She later earned her GED and took classes for one year at Kirkwood Community College. Doss testified that she has difficulty reading and writing and earned poor grades in school. Prior to her alleged disability date of December 31, 2002, Doss was employed sporadically by several businesses for short periods of time between 1984 and 1993. In 1994 and 1995, Doss worked as an assembler for Raytheon Appliances, Inc. She did not work in 1996 or 1997. In 1998, she worked as a housekeeper for Heartland Inn in Cedar Rapids, Iowa. In 1999, she worked for Zoll Enterprises, Inc. (Boston Fisheries) as a cook and food preparer. In 2000, Doss worked as a cashier for Save-A-Lot and as a cashier at a convenience store owned by Hills Maple Crest Farms, Inc. In 2001, she continued her employment at the convenience store and also worked at Boston Fisheries again. Doss did not work in 2002. In 2003, she had two short periods of employment with Nash-Finch Co. and Team Staffing Solutions, Inc.[2] Doss has not worked since 2003.

---

[2] Doss earned $640.29 in 2003.

## B. Administrative Hearing Testimony

### 1. Doss' Testimony

At the October 5, 2005 administrative hearing, Doss testified that she lives with two of her sons, ages 16 and 13, in government subsidized housing.[3] Doss testified that her daily routine included getting up at 7:00 a.m. in order to get her sons off to school. She testified that some days she goes back to bed, some days she stays in her home, and once a week she attempts to volunteer at her church's clothes closet, sorting clothes. However, some weeks she cannot make it to the church clothes closet because she goes back to bed or can't make herself leave the house. She testified that she does occasional cooking, but not everyday. Some days they have lunchmeat sandwiches or cereal instead of a cooked meal. Doss testified that she receives help cleaning her house from her two sons that live at home with her and from her older daughter.

Doss further testified that she has a severe breathing problem and has difficulty walking from one point to another point without having shortness of breath. She testified that her breathing problems cause her fatigue and tiredness. She treats her breathing problem with a nebulizer machine which she uses four to six times per day, an Albuterol inhaler which she uses four to six times per day, and a Combivent inhaler which she also uses four to six times per day. She also testified that she smokes one pack of cigarettes, down from two packs, everyday.

Doss testified that in December, 2001, she had gall bladder surgery. She had complications from the surgery, including a blood clot which had to be removed. Later, she developed a hernia and had surgery to correct it. Doss testified that she had a second hernia operation in the same area, and now is limited in her ability to lift, stoop, and bend.

Doss further testified that she spent time at a drug and alcohol treatment center. She testified that she was a "sporadic" alcohol user and used cocaine for about one year. She

---

[3] Doss gave birth to six children. In April, 2003, her 17 year old son died in an automobile accident. In July, 2004, her oldest son, age 30, committed suicide. Doss' other two children are grown and do not reside with her.

testified that she went to the treatment center to get help because she was chemically dependent. Doss testified that since her doctors have placed her on prescription drug medicine for her health issues, she has not used any alcohol or street drugs.

Doss also testified that she has had depression off and on for her entire life. She testified that the depression worsened after the deaths of her two sons. She testified that she has difficulty sleeping and only gets about four hours of sleep at night. She also testified that she does not like to socialize or be around other people, has anxiety, and worries about her children. She takes anti-depressant medication to treat her depression. She also testified that she has difficulty focusing and concentrating and has difficulty completing tasks.

In May, 2005, Doss was hospitalized for attempted suicide. The ALJ and Doss had the following colloquy regarding her suicide attempt:

> Q: And according to these records, it says that the patient's reason for her suicidal attempt is the fact that she was supposed to report for jail time this weekend.
>
> A: No, that's not why.
>
> Q: Why would they say that if you didn't --
>
> A: I have no --
>
> Q: -- tell them that, why --
>
> A: No, the reason that's in there is because while I was in the hospital, I was concerned about the fact that I had -- that they kept me in the hospital too long. I had jail time coming, and so my doctor wrote a note, had my daughter take care of it. So I think it's more of a --
>
> Q: No, we're not talking about why you were in the hospital. We're talking about why you made the suicide attempt.
>
> A: No, that's not why. I think it's confusion then because it was -- I was concerned about reporting because it was during the time I was in the hospital. And I didn't want a contempt on top of all my other charges.
>
> Q: In that same admission, you were unconscious, and your family indicated that you were doctor shopping and getting medicines from several different sources.
>
> A: Well, that's -- I have all my medicine, and I explained it's all been at one pharmacy, unless the pharmacy was

closed. And if a doctor called, Dr. Schroeder said he
would change something, sometimes I had to go to
Wal-Mart to get it. But other than that, Reitzel's has
always had all of my prescriptions.

Q:    Were you doctor shopping?

A:    No, I just see a lot of doctors for -- . . . I see specialists
for each thing that's wrong with me.

Q:    Why would your family say that?

A:    I don't know.

. . .

Q:    . . . Then what did you do? You got out of the
hospital, and then did you serve your jail time?

A:    Yes, I did.

Q:    And where was this theft by the way?

A:    At JCPenney's.

Q:    What did you pick up?

A:    Clothing for my children for Christmas is what I was
trying to get.

(Administrative Record at 497-99)

Doss testified that her suicide attempt was not for the purpose of trying to avoid
going to jail.[4] She testified that she attempted suicide because of the pain and stress from
the death of her two sons. She stated "I [felt] at a point that I needed to be with those two
sons, that the children here were okay." She testified that she left a suicide note for her
surviving children explaining the reasons she thought suicide was necessary.

### 2. Angela Jenkins' Testimony

Angela Jenkins ("Jenkins") testified as a witness for Doss at the October 5, 2005
administrative hearing. Jenkins is Doss' daughter. She was 29 years old at the time of the

---

[4] At the time of her suicide attempt, Doss was supposed to serve a two-day jail
sentence for interference with official acts. With regard to the criminal charge, Doss
testified that her children were at another residence and called her for assistance after they
were involved in a confrontation. Doss went to assist her children, and police at the
residence determined she was trespassing, and arrested her for interference with official
acts. Doss served her two-day jail sentence.

hearing. Jenkins was questioned by Doss' attorney and provided her impressions of some of Doss' health issues. She testified that Doss' depression made it difficult for her to get out of bed some days. She also testified that Doss doesn't cook, clean, or spend time with her grandchildren as she once did because of her depression. She testified that Doss also has difficulty breathing and walking.

The ALJ also questioned Jenkins. The ALJ's questions focused mainly on Doss' suicide attempt and whether Jenkins told doctors that her mother doctor shopped in order to get medications from different sources. Jenkins testified that she and Doss rarely discuss Doss' health problems. However, she testified that she did know Doss had several doctors and took several different kinds of medicine. Jenkins testified that, because she did not have specific knowledge about her mother's doctors or the medication Doss took, she told doctors that her mother doctor shopped.

### 3. *Vocational Expert's Testimony*

Vocational expert Carma Mitchell also testified at the October 5, 2005 hearing. The record provides the following examination of the vocational expert by the ALJ:

> Q:    If we gave the RFC for light and sedentary work activity, would that include any of [Doss'] past work?
> A:    Well, yes, . . . she'd be able to do the cashier checker, the sales clerk food, the housekeeper cleaner, and the assembly -- sub-assembly. . . .
> Q:    Okay, so the jobs would be what, cashier?
> A:    Okay.
> Q:    Cashier?
> A:    Yes, there was one cashier job that she did as light. . . .
>
> . . .
>
> Q:    All right, so if we disagreed with Dr. Schroeder's radical assessment of [Doss'] mental facility and we find that basically she can do, if she puts her mind to it, simple entry-level work of a light and sedentary nature. . . . [W]hat other jobs would exist?
> A:    Okay, there'd be like light stocking, sales attendant jobs. . . . It could be say, like where a person would

be trying on clothes. They would be stocking items, putting them on shelves or hanging them up again, or taking items out of the dressing rooms. In the state of Iowa, there would be approximately 1,900 positions. In the nation, over 183,000. There would also be jobs like marker, putting tags or labels on items. . . . In the state of Iowa , there'd be over 2,200 positions. In the nation, over 177,000. Those are some examples.

Q:     And sedentary?

A:     Okay, sedentary jobs would include -- let's see.

Q:     In a climate-controlled environment, despite the fact that she still smokes with her emphysema.

A:     Okay, jobs like order clerk. . . . They're sedentary and unskilled. In the state of Iowa, there'd be approximately 200 positions. In the nation, approximately 17,000. There'd also be callout operator. . . . In the state of Iowa, there'd be approximately 130 positions. In the nation, over 11,100. Those are some examples.

(Administrative Record at 515-17)

### C.  Doss' Medical History

#### 1.  Physical Health

On July 19, 1996, a pulmonary function test was performed on Doss by Dr. Robert L. Swaney. The test revealed minimal obstructive airway disease. A chest CT was also taken, and Dr. M.T. Hanigan, M.D., determined that Doss had mild bullous disease at the right upper lobe in the apical region. Dr. Hanigan found no evidence of a parenchymal mass or mediastinal mass. However, Dr. Hanigan found possible calcified stone disease at the neck of Doss' gallbladder. Dr. Hanigan diagnosed Doss with chronic obstructive pulmonary disease ("COPD"). X-rays from August 13, 1996 confirmed COPD with asthma.

On January 7, 2001, Doss went to St. Luke's Hospital Emergency and Trauma Center because she was suffering from chest pain, left arm heaviness, and shortness of

breath.[5] An electrocardiogram was performed and it was normal. Doss was admitted overnight, and on the following day, was examined by Dr. Todd Noreuil, M.D. Dr. Noreuil concluded that Doss had a "normal ventricular size and function with evidence of mild decrease in left ventricular diastolic compliance. Borderline left ventricular hypertrophy, mild left atrial enlargement, trace mitral regurgitation, [and] trace tricuspid regurgitation." Doss also walked for six minutes on a treadmill as part of a cardiolite treadmill examination. Doss had no chest discomfort while walking on the treadmill. Dr. Keith J. Kopec, M.D., found no clinical angina with exercise and no ischemic electrocardiogram changes with exercise.

In October 2002, Doss entered treatment for substance abuse at the Sedlacek Treatment Center. When Doss entered treatment, she was abusing cocaine and alcohol. In addition, at the time she entered treatment she was also dealing with legal issues involving a drug possession charge and an OWI. Doss attended both group and individual counseling sessions for approximately one week before discontinuing her treatment.

On December 8, 2002, Doss went to the emergency room at St. Luke's Hospital for chest pain. She was initially examined by Dr. Craig A. Hovda, M.D. Dr. Hovda concluded Doss suffered a cardiac event and consulted with Dr. Noreuil, who arrived at the hospital to further evaluate Doss. Dr. Noreuil was concerned for angina and set up a heart catheterization test for the following morning. Doss' heart catheterization showed normal left ventricular function and normal left heart filling pressures and systemic pressures. The test also showed minimal coronary luminal irregularities with no obstructive coronary artery disease.

On December 13, 2002, Dr. Michael J. Daly, M.D., performed a laparoscopic cholecystectomy on Doss. Following this procedure, Doss experienced abdominal pain. Dr. Nile S. Dusdieker examined Doss and determined she had a bile leak. On December 18, 2002, Dr. Dusdieker performed an endoscopic retrograde cholangiopancreatography

---

[5] The Administrative Record does not contain any medical records for Doss between August 1996 and January 2001.

with sphincterotomy for Doss' bile leak. The bile leak also required a duct stent. Doss had the duct stent removed on January 24, 2003.

On August 1, 2003, Doss saw Dr. Mark Goedken, M.D., for back pain. Dr. Goedken examined Doss and determined that her back was without any gross deformities or tenderness. He noted that "[s]he is stooped over and has limited [range of motion] with flexion and extension quite severely." Dr. Goedken concluded Doss had a low back strain and treated it with Skelaxin, Ibuprofen, and Lortab and exercise.

On August 20, 2003, Doss went to the St. Luke's Hospital emergency room complaining of abdominal pain. Doss was examined by Drs. Stephen P. Stewart, M.D. and Matthew T. Reid, M.D. Drs. Stewart and Reid determined that Doss' abdominal pain could be treated with medicine and released her to go home with instructions to contact Dr. Goedken within 48 hours. Doss visited Dr. Goedken on August 28, 2003. Dr. Goedken determined that Doss may have an abdominal hernia and referred her to Dr. Kevin R. Kopesky, M.D. Dr. Kopesky diagnosed Doss with a large incisional hernia. Dr. Kopesky performed a surgery to repair the hernia on September 22, 2003.

On February 4, 2004, Doss returned to Dr. Goedken complaining of a bulge in the area where her hernia operation had been performed. Doss also complained of low back pain, bilateral hand tingling, and stress incontinence. Dr. Goedken examined Doss and concluded:

> 1. Overall I think [Doss'] depression continues to be a problem. . . . I would like to have her see a psychiatrist. 2. Stress incontinence that I would like to manage conservatively. 3. Low back pain likely DJD [degenerative joint disease] related to her weight. Also I am thinking her depression is playing into this as well. 4. Reflux esophagitis failing conservative H2 blocker management. 5. Numbness and tingling in her fingers is likely related to her carpal tunnel that she has had in the past and she is managing conservatively.

(Administrative Record at 217) Dr. Goedken's treatment plan consisted of referring Doss to a psychiatrist for depression management, the use of Tylenol for her back pain, Kegel

exercises for her incontinence, and referring her to Dr. Kopesky to determine whether she
has a recurrent hernia.

On February 23, 2004, Doss was examined by Dr. Douglas T. Sedlacek, M.D., for
her back pain. Dr. Sedlacek found Doss to have reasonable flexion but found it "quite
limited." Dr. Sedlacek also found point tenderness over the L5-S1 facet on the left and
marked tenderness on the right near the sacroiliac joint. Dr. Sedlacek concluded Doss had
acute exacerbation of low back pain and possible sacroiliitis versus facet versus
myofascial. Dr. Sedlacek treated Doss by giving her a sacroiliac joint injection. Doss
returned to Dr. Sedlacek on March 3, 2004. She showed improvement over her sacroiliac
joint from the injection. Upon examination, Dr. Sedlacek found slight tenderness over her
facet joints at L5-S1 and L4-5. Dr. Sedlacek also noted that she continued to have limited
flexion and limited extension. Dr. Sedlacek treated Doss' back pain with an epidural
injection at L5-S1. Doss saw Dr. Sedlacek again on April 22, 2004 for back pain.
Dr. Sedlacek noted that Doss' right lumbosacral pain had improved, but now had right
radicular pain and degenerative lumbar spinal disease. Dr. Sedlacek treated Doss by
giving her a transforaminal epidural steroid block at L5-S1 on her right side.

On March 10, 2004, Doss saw Dr. Robert J. Schultes, M.D., for a consultative
examination for Disability Determination Services ("DDS"). Doss told Dr. Schultes that
she could do the following: (1) lift 10 pounds one hour per day, (2) carry 10 pounds for
one hour per day, (3) stand for two hours per day, (4) move about for two hours per day,
(5) walk for one hour per day, (6) sit for three hours per day, (7) stoop for 30 minutes per
day, (8) kneel for 30 to 60 minutes per day, (9) crawl for two to three hours per day,
(10) handle objects for three to four hours per day, (11) travel three hours per day, and
(12) drive a car. Doss also told Dr. Schultes that she could not climb, work around dust
or fumes, work in temperatures above 80 degrees, or work around hazards. Dr. Schultes
found nothing remarkable upon his physical examination of Doss. Dr. Schultes diagnosed
Doss with a history of complications with gallbladder surgery, recurrent hernia surgery in
the right upper quadrant, chronic low back pain, right wrist pain and hand numbness,

COPD, and a history of depression. Dr. Schultes suggested that a residual functional capacity ("RFC") assessment should be performed.

On March 16, 2004, Doss saw Dr. Kopesky regarding the bulge and pain in her right upper quadrant. Upon examination, Dr. Kopesky determined that Doss suffered from a recurrent incisional hernia. Dr. Kopesky surgically repaired the hernia.

On April 15, 2004, Dr. Chrystalla B. Daly, D.O., reviewed Doss' medical records and provided DDS with an RFC assessment. Dr. Daly found that Doss had the ability to: (1) occasionally lift 20 pounds and frequently lift 10, (2) stand or walk with normal breaks for about six hours in an eight-hour workday, (3) sit with normal breaks for about six hours in an eight-hour workday, (4) push and/or pull without limitations, and (5) occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. Dr. Daly also determined that Doss could never climb ladders, ropes, or scaffolds. Dr. Daly further determined that Doss had no manipulative, visual, communicative, or environmental limitations.

On May 13, 2004, Doss saw Dr. Loren J. Mouw, M.D., with continued back pain. After examining Doss, Dr. Mouw determined that she had a herniated intervertebral disc at L4-5. Doss elected for surgery as treatment. Dr. Mouw performed an L4-5 right minimally evasive diskectomy on May 14, 2004. At a follow-up visit, Dr. Mouw determined that Doss had a recurrent herniated intervertebral disc at L4-5. Dr. Mouw performed a second diskectomy on May 26, 2004.

On August 18, 2004, Doss saw Dr. Tinofa O. Muskwe, M.D., regarding shortness of breath. Dr. Muskwe examined Doss and determined that she had chronic dyspnea. Dr. Muskwe treated her condition with Albuterol. Doss next saw Dr. Muskwe on August 27, 2004. Dr. Muskwe determined that pulmonary function tests performed on Doss suggested early restrictive lung physiology. Dr. Muskwe continued treatment with Albuterol. Doss saw Dr. Muskwe again on September 23, 2004, with continued shortness of breath. Dr. Muskwe reviewed a CAT scan of Doss' lungs and concluded that she had mild bullous emphysema and mild lung parenchyma compatible with small airways

disease. Dr. Muskwe treated the condition with Albuterol and Advair Diskus. Doss visited Dr. Muskwe again on December 22, 2004. Dr. Muskwe diagnosed Doss with COPD. Dr. Muskwe discontinued Doss' use of Advair Diskus and replaced it with Combivent. Doss next visited Dr. Muskwe on March 23, 2005. Prior to her visit, she had seen her primary care physician twice in a three to four week span for acute bronchitis. The bronchitis was treated with antibiotics. Dr. Muskwe determined Doss had an upper respiratory tract infection and treated it with medication. Dr. Muskwe also noted that her physician had started her on an Albuterol nebulizer. Doss saw Dr. Muskwe again on July 5, 2005. Dr. Muskwe found that she had COPD exacerbation and dyspnea with exertion. Dr. Muskwe changed Doss' Albuterol nebulizer to DuoNeb as treatment.

On October 4, 2004, Dr. John A. May, M.D., reviewed Doss' medical records and provided DDS with a second RFC assessment. Dr. May concluded that Doss had the ability to: (1) occasionally lift 20 pounds and frequently lift 10, (2) stand or walk with normal breaks for about six hours in an eight-hour workday, (3) sit with normal breaks for about six hours in an eight-hour workday, (4) push and/or pull without limitations, and (5) occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. Dr. May also determined that Doss could never climb ladders, ropes, or scaffolds. Dr. May further determined that Doss had no manipulative, visual, or communicative limitations. Lastly, Dr. May found that Doss had no environmental limitations except that she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

On May 24, 2005, Doss was taken to St. Luke's Hospital Emergency and Trauma Center after an apparent overdose. Upon arriving at the emergency room, Doss was treated by Dr. Reid. Dr. Reid noted that Doss appeared to have overdosed on her medication and left a note saying goodbye to her family. After her initial appearance at the emergency room, Doss was transferred to the care of Dr. Muskwe and was admitted to the intensive care unit for observation. Dr. Muskwe noted that:

> [Doss] presented to St. Luke's Hospital after she was found down by her son. [Doss] was found with a note that indicated that she wanted to take her life to be with two of her deceased

children. She was rushed to the emergency room, where she was noted on arrival to be unresponsive with no gag reflex and no response to painful stimulus. [Doss] was promptly intubated for airway protection and mechanical ventilation was started. Evaluation in the emergency room revealed that [Doss] may have taken all of her medications, including Wellbutrin, Seroquel, Tylenol, [A]lprazolam, [and] Zoloft.

(Administrative Record at 398)

Dr. Dwight J. Schroeder, M.D., Doss' psychiatrist, provided a consultation on May 25, 2005. Dr. Schroeder noted that:

[Doss] took an overdose of medications leaving a suicide note for her family. The family found her unconscious. . . . She carries a diagnosis of major depressive disorder, recurrent. Family indicates that she has been doctor shopping and getting medications from several different sources, that she will often take her Xanax inappropriately and run out of it 1-2 weeks before she can get her next refill at which time she will then begin using Seroquel so that she sleeps all the time and does not feel the anxiety. It is unknown whether or not she has been totally medication compliant at this point. She continues to have decreased moods. There is a concern that a local physician may be giving [sic] medications in addition to myself.

(Administrative Record at 396) Dr. Schroeder's treatment plan consisted of not restarting Doss on Seroquel and withdrawing her from Xanax. Dr. Schroeder also planned to reevaluate Doss' use of Luvox and Wellbutrin when she was better able to participate in the treatment process.[6] Dr. Muskwe also saw Doss on May 25, 2005. Dr. Muskwe noted that "[t]he patient's reason for her suicidal attempt is the fact that she was supposed to report for jail time this weekend." Dr. Muskwe spoke with Doss again on May 26, 2005, and Doss told Dr. Muskwe that she "recalls having tried to commit suicide and she was very remorseful and tearful. She would like not to repeat this in the future and would like

---

[6] At the time of Dr. Schroeder's consultation, Doss was not able to communicate because she had just been extubated and was very drowsy.

Case 1:06-cv-00147-JSS   Document 16   Filed 09/11/07   Page 15 of 33

to concentrate on the remainder of her living children. She told me that she is supposed to do two days of jail time because she assaulted a police officer."

On February 9, 2006, Doss went to St. Luke's Hospital with chest pain. Doss was admitted, and on February 10, 2006, Dr. Farouk Belal, M.D., performed a cardiac catheterization. The cardiac catheterization showed: (1) Nonobstructive lesion in the ostia ramus intermedius of 20%, (2) condominant circulation with a large cricumflex and a small right coronary artery with very likely occluded, posterolateral branch with left to right collaterals, and (3) remarkable segmental wall motion abnormality with anteroapical hypokinesia with a reduced ejection fraction of 35% to 40%. Doss was diagnosed with status post myocardial infarction, urinary tract infection, hypothyroidism, and depression. Doss was discharged in good condition on February 13, 2006, and was scheduled for follow-up appointments with her primary care physician for thyroid medication. She was also scheduled for an appointment with Dr. Noreuil for cardiology assessment and cardiology phase II rehabilitation. Doss was also given the following medications, Keflex, Tiazac, Metoprolol, aspirin (enteric-coated), and Lisinopril, in addition to her other medications, Albuterol, Atrovent, and Combivent.

### 2. Mental Health

On February 13, 2004, Doss met with Dr. Schroeder for a psychiatric evaluation. Dr. Goedken referred Doss to Dr. Schroeder for the evaluation. Dr. Schroeder noted the following regarding Doss' psychological history:

> Her mood is down. Her energy is down. Her motivation is down. Sleep is down with initial and middle insomnia. Appetite is up with weight gain of some 70 pounds in the last 10 months. Interest is down. Sexual interest is down. Concentration is down. Memory is okay. She notes she gets very little exercise. She is still grieving for the loss of her son who was killed in a motor vehicle accident about 10 months ago. She has a lot of I don't care attitude, especially whether she lives or dies. She notes there are days she will not take a shower. There is social isolation, irritability, suspiciousness, excess worrying. She notes that she needs to write everything down, such as lists, otherwise she will forget them. She has

> crying spells, worthlessness, some guilt. She denies
> hopelessness, homicidal ideations, hallucinations. She is
> currently taking Paxil 40 mg a day and Wellbutrin XL 150 mg
> a day.

(Administrative Record at 364) Dr. Schroeder diagnosed Doss as having a major depressive disorder. Dr. Schroeder's treatment plan consisted of exercise three to five times per week as her back problems would allow, abstinence from all alcohol and mood-altering substances, an increase in Paxil up to 60 mg per day, an increase in Wellbutrin XL up to 300 mg per day, and starting Vistaril at 50-100 mg for sleep. Dr. Schroeder also referred Doss to Marcia Akin ("Akin") for individual therapy.

On February 24, 2004, Jacque Fiedler ("Fiedler"), a licensed psychologist, interviewed Doss for the purpose of providing DDS with a psychological report. After conducting several clinical tests, Fiedler concluded that Doss had "fairly good short-term recall and reasonable long-term memory functioning. Her ability to attend, concentrate, and focus was somewhat variable but not seen as significantly impaired." Fiedler also found that Doss was restricted in her social and interpersonal skills and chose to spend most of her time with family. Fiedler also concluded that Doss could "self-direct" if needed and had functional academic skills. Fiedler drew the following conclusions regarding Doss' ability to work:

> Based upon the information currently available, it is this
> examiner's professional opinion that [Doss] could remember
> and understand up to mild/moderately complex instructions,
> procedures, and locations. She appears capable of carrying
> out mild/moderate instructions, and maintaining a reasonable
> degree of attention, concentration, and pace in an appropriate
> work environment. Her obsessing about her current
> difficulties, health issues, and loss of her son notwithstanding,
> it is felt that she could interact appropriately with supervisors,
> co-workers, and the public. Work based judgment is seen as
> possibly problematic. [Doss] would probably need some type
> of assistance and support in responding to changes in the work
> place.

(Administrative Record at 232) Fiedler diagnosed Doss with depressive disorder "by history and current treatment" and determined her GAF (Global Assessment of Functioning) to be 62/65.

On March 19, 2004, Dr. John F. Tedesco, Ph.D. provided a psychological functional capacity assessment based on a review of Doss' records. Dr. Tedesco found that Doss had mild limitations on restrictions of daily living and difficulties in maintaining social functioning. Dr. Tedesco found Doss had moderate limitations on difficulties in maintaining concentration, persistence, or pace. Dr. Tedesco also determined that Doss was moderately limited in her ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (3) respond appropriately to changes in the work setting. Dr. Tedesco concluded:

> On a mental basis, evidence does not support the existence of marked functional impairments. [Doss] has had depression throughout much of her life but has been able to episodically work. In addition, she has not sought treatment until the past several months. Current [clinical evaluation] results are not indicative of marked functional impairments. Activities of daily living are not markedly limited by [Doss'] mental condition.

(Administrative Record at 257)

On October 13, 2004, Dr. Carole Davis Kazmierski, Ph.D. provided a second psychological functional capacity assessment. Dr. Kazmierski found Doss had depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Dr. Kazmierski further determined that Doss had moderate limitations in restriction of activities of daily living and difficulties in maintaining social functioning. Dr. Kazmierski also determined that Doss had marked limitations in difficulties in maintaining concentration, persistence, or pace. Dr. Kazmierski also found that Doss was moderately limited in her ability to: (1) carry out detailed instructions,

(2) maintain attention and concentration for extended periods, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (5) respond appropriately to changes in the work setting. Dr. Kazmierski diagnosed Doss with major depressive disorder. Dr. Kazmierski noted that Doss was under the psychiatric care of Dr. Schroeder in the spring of 2004 and that she was making progress in coping with her depression. However, Doss' depression worsened in July 2004 after her oldest son committed suicide. Dr. Kazmierski concluded:

> [Doss'] emotional lability and grief will make it difficult for her to maintain concentration in a work setting at the present time. It is expected, however, that the intensity of [Doss'] grief will diminish over time, her day to day functioning will be less disrupted by her distress, and her depression will once again stabilize. By 7/05 [Doss] should return to her previous level of adjustment, with no more than moderate restrictions in work related functioning as outlined in this MRFCA [Mental Residual Functional Capacity Assessment] and in the 3/19/04 MRFCA completed by Dr. Tedesco.

(Administrative Record at 377)

On December 22, 2004, Dr. Schroeder provided Doss' counsel with a mental impairment questionnaire regarding Doss' mental functional capacity. Dr. Schroeder had been Doss' treating psychiatrist for ten months when he filled out the questionnaire. Dr. Schroeder had previously diagnosed Doss with major depressive disorder. Dr. Schroeder listed the following signs and symptoms of Doss' depressive disorder: Anhedonia, decreased energy, blunt, flat, or inappropriate affect, feelings of guilt or worthlessness, poverty of content of speech, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation or retardation, persistent disturbances of mood or affect, disorientation to time and place, easy distractibility, memory impairment, and sleep disturbance. Dr. Schroeder also reported that Doss was seriously limited but not precluded in remembering work-like procedures,

understanding and remembering very short and simple instructions, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with normal work stress, understanding, remembering, and carrying out detailed instructions, setting realistic goals or making plans independently of others, and maintaining socially appropriate behavior. Dr. Schroeder also determined that Doss had moderate limitation of restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence, or pace. Dr. Schroeder concluded that Doss' impairments were reasonably consistent with symptoms and functional limitations described in the questionnaire.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Doss is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

The ALJ applied the first step of the analysis and determined that Doss had not engaged in substantial gainful activity since her alleged onset date, December 31, 2002.[7] At the second step, the ALJ concluded, from the medical evidence, that Doss had the following severe impairments:

> Major depression, a substance abuse disorder, degenerative disc disease of the lumbar spine status/post laminectomy, status/post multiple incisional hernia repairs, chronic obstructive lung disease, emphysema, and obesity.

At the third step, the ALJ found that Doss "[did] not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4." At the fourth step, the ALJ determined Doss' RFC as follows:

> [T]he claimant has the residual functional capacity to perform work at the light exertional level, or work which requires

---

[7] The ALJ notes that Doss worked through August 2003, but her earnings did not represent substantial gainful activity.

lifting or carrying up to 20 pounds occasionally and up to 10 pounds frequently, sitting up to 6 hours of an 8-hour day, and standing or walking up to 6 hours of an 8-hour day. The claimant's depressive disorder restricts her to simple entry level work.

Using this RFC, the ALJ determined that Doss met her burden of proof at the fourth step, because she was unable to perform her past relevant work. However, at the fifth step, the ALJ determined that Doss, based on her age, education, previous work experience, and RFC, could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Doss was "not disabled."

### B. Doss' Residual Functional Capacity

Doss alleges that the ALJ erred in several respects. She argues that the ALJ erred by failing to give "good reasons" for discounting Dr. Schroeder's assessment of her having multiple mental limitations and ignoring the effect of one son's death, another son's suicide, and her own suicide attempt within a thirty month period. Doss further argues that the ALJ erred because she failed to make a function-by-function assessment of her mental and physical RFC. Doss also points out that the ALJ's RFC assessment and hypothetical question to the vocational expert failed to consider the extra time she may need during an eight-hour workday to use her nebulizer. Lastly, Doss contends that the ALJ erred by failing to consider the combined effects of her emphysema, gallbladder surgery and subsequent hernias, depression, and back pain on her ability to work. Doss requests that the court reverse the Commissioner's decision and remand it with directions to award benefits. Alternatively, Doss requests this matter be remanded for further proceedings, including a proper evaluation of Dr. Schroeder's opinions, a function-by-function analysis of her mental and physical RFC, and proper consideration of all of her health problems over the past three years. The Commissioner argues that there is substantial evidence in the record as a whole which supports the ALJ's decision; and therefore, the decision should be affirmed.

## 1. Dr. Schroeder's Opinions

Doss argues that Dr. Schroeder included several work-related limitations in his assessment of Doss' mental functional capacity performed on December 22, 2004. Doss points out that the ALJ failed to address these limitations in her RFC assessment. Doss contends that the ALJ did not offer sufficient reasons for disregarding Dr. Schroeder's opinions or for not including the work-related limitations in Dr. Schroeder's mental functional capacity assessment in her RFC for Doss. The Commissioner replies that the ALJ properly determined that Dr. Schroeder's opinions were not entitled to controlling weight. The Commissioner further argues that the ALJ gave specific reasons for discounting Dr. Schroeder's opinions. The Commissioner concludes that the ALJ's determinations regarding the weight afforded to Dr. Schroeder's opinions is supported by substantial evidence; and therefore, the ALJ's decision should not be disturbed.

The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to
> substantial weight. A treating physician's opinion regarding
> an applicant's impairment will be granted controlling weight,
> provided the opinion is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh*, 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id*. "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v.*

*Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

When a consulting physician only examines a claimant once, his or her opinion generally does not constitute "substantial evidence." *Anderson*, 344 F.3d at 812; *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."). An ALJ's decision to credit a one-time consulting physician's opinion and discount a treating physician's opinion should only be upheld under two exceptions to the general rule: "'(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Anderson*, 344 F.3d at 812-13 (quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

The ALJ determined that "Dr. Schroeder's objective findings are not consistent with the marked limitations reported on his assessment. Dr. Schroeder's opinions are not supported by his objective findings and thus are not entitled to controlling weight." The ALJ also determined that Dr. Schroeder's opinions deserved less weight than those of the consultative psychologists because they were "not supported by the substantial evidence of record." Specifically, the ALJ noted that after Doss began therapy with Dr. Schroeder, "[h]er depression improved, she smiled frequently, discussed a variety of topics, and thought about her deceased son less often. She was spending beneficial time with her grandchildren and her mother, and was planning to turn her enjoyment of crafts into a part-

time business."[8] The ALJ further notes that Doss' improvement decreased after her oldest son committed suicide in July, 2004. However, the ALJ found that "[c]oncentration and memory improved to acceptable levels by the following month. By May, 2005, [Doss] exhibited better psychomotor activity, acceptable insight, judgment, cognition, and memory, and no suicidal ideation." The ALJ concluded that "Dr. Schroeder's treatment notes show good response of [Doss'] depressive symptoms to treatment, with only short periods of exacerbation following her son's death." The ALJ also found that the consultative opinion of licensed psychologist Jacque Fiedler deserved substantial weight. The ALJ also noted that the second consultative opinion from the State agency[9] provided that "[Doss] had begun to recover from her initial grief reaction by June, 2004. This period of grief was also expected to last less than 12 months, after which the claimant was determined to be able to return to her previous level of functioning."

The ALJ lists Exhibits 21F/12, 21F/10, 21F/9, 21F/8, 30F/8, 30F/4, and 30F/2 as support for her conclusion that Doss' depressive symptoms improved and that "Dr. Schroeder's objective findings [were] not consistent with the marked limitations reported on his assessment."[10] These exhibits are Dr. Schroeder's progress notes from times that he met with Doss in 2004 and 2005. The Court will summarize each exhibit in turn.

Dr. Schroeder's progress note dated June 8, 2004 (Exhibit 21F/12) provides that Doss' mood, affect, and insight/judgment were down, her sleep was worse, her thought

---

[8] *See* Exhibits 21F/10-13. The ALJ appears to rely on Exhibit 21F/13 at p. 363 of the Administrative Record in particular. Exhibit 21F/13 contains typed notes from Marcia Akin, a social worker who is employed by Dr. Schroeder and sometimes met with Doss for counseling sessions. The ALJ quotes these notes to show Doss' improved depressive symptoms. It should be noted that these notes were taken on May 5, 2004, prior to her oldest son committing suicide.

[9] The second consultative opinion was performed by Dr. Kazmierski.

[10] *See* Exhibits at pp. 362, 360, 359, 358, 453, 449, and 447 of the Administrative Record respectively.

25

processes and cognition/memory were okay, and her psychomotor activity was better. Dr. Schroeder's progress note dated June 29, 2004 (Exhibit 21F/10) provides that Doss' mood, sleep, appetite, and affect were down, she had increased anxiety and feelings of worthlessness and guilt, and her energy, thought processes, insight/judgment, cognition/memory, and psychomotor activity were okay. Dr. Schroeder's progress note dated July 20, 2004 (Exhibit 21F/9) provides that Doss' mood, interest, concentration/memory, energy, psychomotor activity, affect, and cognition/memory were down, she had increased anxiety, and her sleep, thought processes, and insight/judgment were okay. Dr. Schroeder's progress note dated August 12, 2004 (Exhibit 21F/8) provides that Doss' mood, affect, and energy were down, she had increased anxiety, and her concentration/memory, thought processes, insight/judgment, and sleep were okay. Dr. Schroeder's progress note dated January 11, 2005 (Exhibit 30F/8) provides that Doss' mood, interest, concentration/memory, energy, affect, insight/judgment, and cognition/memory were down, she had anxiety, and her psychomotor activity was okay. Dr. Schroeder's progress note dated May 3, 2005 (Exhibit 30F/4) provides that Doss' mood, interest, concentration/memory, energy, and affect were down, she had anxiety and feelings of worthlessness and guilt, her sleep and psychomotor activity were better, and her insight/judgment and cognition/memory were okay. Dr. Schroeder's progress note dated August 25, 2005 (Exhibit 30F/2) provides that Doss' sleep, concentration/memory, affect, and cognition/memory were down, her mood was better, and her psychomotor activity and insight/judgment were okay.

The ALJ found that Doss' depressive symptoms improved after she began treatment from Dr. Schroeder. However, the ALJ noted that Doss' improvement decreased after the death of her oldest son, who committed suicide in July 2004, but her "[c]oncentration and memory improved to acceptable levels by the following month. By May, 2005, [Doss] exhibited better psychomotor activity, acceptable insight, judgment, cognition, and memory, and no suicidal ideation."

The Court, having reviewed the record, including the exhibits summarized above, finds that the ALJ's conclusions regarding Dr. Schroeder's opinions are not supported by substantial evidence on the record as a whole. Specifically, a review of Dr. Schroeder's progress notes shows that Doss' mood, interest, concentration/memory, energy, psychomotor activity, affect, and cognition/memory were down after the death of her oldest son who committed suicide in July, 2004. Dr. Schroeder's August 12, 2004 progress note shows that Doss' mood, affect, and energy were down and her memory/concentration had improved. However, Dr. Schroeder's January 11, 2005 and May 3, 2005 progress notes show that Doss' concentration/memory, mood, interest, energy, and affect were down from August, 2004. Furthermore, Doss attempted suicide on May 24, 2005. In addition, Dr. Schroeder's August 25, 2005 progress note also shows that Doss' concentration/memory and cognition/memory were down. Dr. Schroeder's progress notes clearly show that Doss continued to have significant depressive symptoms five and nine months after her oldest son committed suicide, including attempted suicide almost 10 months after her son's suicide. Based on this review of Dr. Schroeder's progress notes, the Court finds that the ALJ's conclusion that "Dr. Schroeder's treatment notes show good response of [Doss'] depressive symptoms to treatment, with only short periods of exacerbation following her son's death" is not supported by substantial evidence.

Furthermore, the opinion of a treating physician, generally, should not be disregarded and should be given substantial weight. *See Singh*, 222 F.3d at 452. However, an ALJ may disregard or discount the opinion of a treating physician if other medical assessments are supported by superior medical evidence. *See Hogan*, 239 F.3d at 961. In this case, the ALJ relies on the psychological assessments of three consultative psychologists to discount Dr. Schroeder's opinions. The ALJ may credit the one-time consulting psychologists' opinions and discount Dr. Schroeder's opinions if the one-time medical assessments are supported by better or more thorough medical evidence. *See Anderson*, 344 F.3d at 812-13. The ALJ cannot meet this burden because none of the

consultative psychologists considered Doss' suicide attempt on May 24, 2005 and only one of them considered the effect her oldest son's suicide in July 2004 had on her. That psychologist concluded that Doss' grief regarding her oldest son's suicide would last less than 12 months and she would then return to her normal functioning. However, the record shows that after her son's suicide, she attempted suicide on May 24, 2005, approximately 10 months after his death, and left a suicide note to her family indicating that she felt they would be okay without her and that she needed to be with her two deceased sons. The Court finds that Doss' oldest son's suicide in July, 2004 and her own suicide attempt on May 24, 2005 constitute significant medical evidence which was not considered by the consultative psychologists; and therefore, the opinions of the consultative psychologists are not supported by better or more thorough medical evidence. *See Anderson*, 344 F.3d at 812-13 (crediting the opinion of a consultative physician over a treating physician should be upheld where the one-time assessment is supported by better or more thorough medical evidence.). Accordingly, the Court finds that the ALJ improperly discounted Dr. Schroeder's opinion in comparison to the opinions of the three consultative psychologists. The Court determines that it is appropriate to remand this case to allow the ALJ to further consider Dr. Schroeder's opinions and further develop the record with regard to crediting or discrediting Dr. Schroeder's opinions.

### 2. *Function-by-Function Assessment of Doss' Mental RFC*

Doss argues that the ALJ failed to make a function-by-function assessment of her RFC with regard to her psychological limitations. Specifically, Doss argues that the ALJ failed to consider or address limitations provided by Dr. Schroeder and limitations provided by Dr. Kazmierski in her consultative psychological evaluation. Doss requests that this matter be remanded for a proper RFC assessment.

The ALJ is responsible for determining a claimant's RFC, which should be based on "'all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez*, 403 F.3d at 957 (quoting *Pearsall*, 274 F.3d at 1217). Hypothetical questions posed to a vocational

expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). However, the ALJ does not need to include all impairments that are suggested by the evidence. *Goff*, 421 F.3d at 794. The ALJ may exclude from the hypothetical any impairment that the ALJ rejects as either "untrue or unsubstantiated." *Hunt*, 250 F.3d at 625 (citing *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

The ALJ determined Doss' RFC as follows:

> [T]he claimant has the residual functional capacity to perform work at the light exertional level, or work which requires lifting or carrying up to 20 pounds occasionally and up to 10 pounds frequently, sitting up to 6 hours of an 8-hour day, and standing or walking up to 6 hours of an 8-hour day. The claimant's depressive disorder restricts her to simple entry level work.

In his mental capacity assessment, Dr. Schroeder determined that Doss was seriously limited but not precluded in remembering work-like procedures, understanding and remembering very short and simple instructions, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with normal work stress, understanding, remembering, and carrying out detailed instructions, setting realistic goals or making plans independently of others, and maintaining socially appropriate behavior. Dr. Schroeder also determined that Doss had moderate limitation of restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence, or pace.

Dr. Kazmierski, determined that Doss had marked limitations in difficulties in maintaining concentration, persistence, or pace. Dr. Kazmierski also found that Doss was

moderately limited in her ability to: (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (5) respond appropriately to changes in the work setting. Dr. Kazmierski further determined that Doss had moderate limitations in restriction of activities of daily living and difficulties in maintaining social functioning.

Additionally, Dr. Tedesco, also a consultative psychologist who provided a mental RFC assessment for Doss, concluded that Doss had moderate limitations on difficulties in maintaining concentration, persistence, or pace. Dr. Tedesco also determined that Doss was moderately limited in her ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (3) respond appropriately to changes in the work setting.

The Court finds the ALJ's RFC assessment that "[Doss'] depressive disorder restricts her to simple entry level work" is insufficient based on the relevant evidence in the record. Drs. Schroeder, Kazmierski, and Tedesco clearly place limitations on Doss' abilities to work based on their assessments of her mental RFC. The Court finds that the ALJ should specifically address these limitations in her assessment of Doss' RFC. *See Tellez*, 403 F.3d at 957 (an ALJ is responsible for determining a claimant's RFC, which should be based on "'all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" (quoting *Pearsall*, 274 F.3d at 1217)). Therefore, the Court remands this matter for further consideration by the ALJ of the opinions of Drs. Schroeder, Kazmierski, and Tedesco on Doss' limitations provided in their mental RFC assessments for Doss. On remand, the ALJ should fully explain her reasons for accepting or rejecting the opinions

and limitations found by Drs. Schroeder, Kazmierski, and Tedesco in her RFC assessment for Doss.

### 3. The Nebulizer and The Combined Effects of Doss' Mental and Physical Health

Doss argues that the ALJ's RFC assessment and her hypothetical question to the vocational expert failed to consider her use of a nebulizer for her breathing problems. Specifically, Doss points out that she uses her nebulizer at a minimum of four to six times per day. Each time she uses the nebulizer it takes her fifteen to twenty minutes for the treatment. Doss contends that the ALJ should have considered the amount of time it takes her to use the nebulizer in her RFC and in the hypothetical question to the vocational expert because her use of it would require additional, unscheduled breaks during an eight-hour workday. The Commissioner does not address this argument in his brief.

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt*, 250 F.3d at 625 (citation omitted). Further, "the hypothetical question answered by a vocational expert must include all those impairments that are substantially supported by the record as a whole." *Taylor*, 118 F.3d at 1278-79. However, the ALJ does not need to include all impairments that are suggested by the evidence. *Goff*, 421 F.3d at 794. The ALJ may exclude from the hypothetical any impairment that the ALJ rejects as either "untrue or unsubstantiated." *Hunt*, 250 F.3d at 625 (citation omitted).

Doss has used a nebulizer at a minimum of four to six times per day since March, 2005. Accordingly, the Court determines that on remand, the ALJ should consider and discuss the effects, if any, that Doss' use of a nebulizer may have on Doss' RFC and include this discussion in the hypothetical to a vocational expert. *See Hunt*, 250 F.3d at 626 ("When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.").

Lastly, Doss argues that the ALJ failed to consider the combined effects of Doss' emphysema, gallbladder surgery, subsequent hernias, depression, and back pain in her decision. The Court finds that the ALJ did consider each these health issues as they relate to Doss. Therefore, the Court determines that on remand, the ALJ need not consider this issue.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to consider or provide proper reasons for disregarding certain opinions pertinent to Doss' RFC and the hypothetical question presented to the vocational expert. Accordingly, the Court finds that remand is appropriate.

### VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ should develop the record fully and fairly, and

either consider the opinions of Dr. Schroeder or more fully explain the reasons for disregarding his opinions. The ALJ should also address the opinions of Drs. Schroeder, Kazmierski, and Tedesco as to Doss' mental limitations as to her RFC and the hypothetical question presented to the vocational expert. The ALJ should also consider whether Doss' use of a nebulizer has an effect on her RFC or the hypothetical question to the vocational expert.

### VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this _____11ᵗʰ_____ day of day of September, 2007.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA